UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| JOHN Q. RODGERS, | No. CV 15-9441 PA (ASx) |
| Plaintiff, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

The Court, sitting without a jury, conducted a bench trial on June 13, 2017.

Following the Court Trial, the Court ordered the parties to submit proposed Findings of Fact and Conclusions of Law. Pursuant to the Court's instructions, the parties reviewed the other side's proposed Findings of Fact and Conclusions of Law and marked them to indicate the particular factual assertions and legal conclusions they agreed with and those they disputed, and also filed their reasons for their objections. (Dkt. Nos. 106-111.) The facts that are in dispute on which the Court relies in reaching its conclusion are supported by the record. Unless otherwise noted, where evidence is subject to an evidentiary objection, and the Court has relied on that evidence, the Court has overruled the evidentiary objection for the reason or reasons identified by the party offering the evidence in response to the other side's objection. Where the Court has refused to consider evidence subject to an

objection, the Court will indicate the basis for sustaining the evidentiary objection. All other evidentiary objections to evidence that the Court has not relied on or cited in these Findings of Fact and Conclusions of Law are denied as moot.

After reviewing the evidence, the parties' objections to that evidence, and the parties' pre-trial and post-trial submissions, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a). Any finding of fact that constitutes a conclusion of law is hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby adopted as a finding of fact.

## Findings of Fact

1. Plaintiff John Q. Rodgers ("Rodgers" or "Plaintiff") initiated this action on December 7, 2015, by filing a Complaint for Refund and Abatement of Tax Penalties against defendant United States of America (the "Government"). (Docket No. ("Dkt.") 1.) Plaintiff is a licensed certified public accountant and attorney against whom the Internal Revenue Service (the "IRS") assessed fourteen $5,000.00 penalties under 26 U.S.C. § 6694(b) ("Section 6694(b)") for willful or reckless understatements of liability on tax returns prepared by Plaintiff.

2. After Plaintiff filed this action, the Government conceded five of the fourteen penalties. The remaining nine tax returns which the Government maintains Plaintiff prepared in violation of Section 6694(b) consist of the 2009 and 2010 tax returns for Joseph Ross ("Ross"), Scott Keller ("Keller"), Rossmith Packaging, Inc. ("Rossmith"), and Ross Pac, Inc. ("Ross Pac"), as well as the 2010 tax return for Freshtech Inc. ("Freshtech").

3. Plaintiff asserts that each of these nine penalties were inappropriately assessed against him, and seeks the return of the portion of the penalty Plaintiff paid as a requirement for filing this action, see 26 U.S.C. 6694(c), and abatement of the unpaid balance of the penalty.

4. The Government filed a Counterclaim seeking judgment in the amount of $61,034.48, the unpaid balance of the penalty. (Dkt. 12.)

1      5.      Rodgers is a licensed California attorney and has been so since 1985.  Rodgers

2   Decl. (Dkt. 60), ¶ 5.

3      6.      Rodgers is a certified public accountant and has been so since 1989.  Rodgers

4   Decl.(Dkt. 60), ¶ 4.

5      7.      Rodgers has been working as an accountant and a tax attorney in his own

6   practice since 1986.  Rodgers Decl. (Dkt. 60), ¶ 6.

7      8.      Since 2010, Rodgers has conducted his tax-return-preparation practice through

8   a corporation named John Q. Rodgers Law Corporation.  Rodgers Decl. (Dkt. 60), ¶ 8.

9      9.      Before starting his own practice, he worked as a staff tax accountant at Arthur

10  Anderson & Co and as a tax practitioner at Computer Language Research/Fast-Tax; Del

11  Ferguson CPA; and the Law Offices of Tim Moore.  Rodgers Decl. (Dkt. 60), ¶ 7.

12     10.     Ramon Barbieri is a certified public accountant and has been so since 1988.

13  Barbieri Decl. (Dkt. 63), ¶ 2.

14     11.     In 2003, Barbieri joined John Rodgers in his office, but maintained his own

15  practice.  Barbieri Decl. (Dkt. 63), ¶ 5.

16     12.     In 2009 or 2010, Barbieri and Rodgers formed a partnership.  Barbieri Decl.

17  (Dkt. 63), ¶ 6.

18     13.     Barbieri's professional focus is financial accounting.  Barbieri Decl. (Dkt. 63),

19  ¶ 7.

20     14.     Alla Troitskaya is a tax return preparer employed by Rodgers since 2004.

21  Trial Tr. (Troitskaya) at 159:16.

22     15.     Troitskaya processes about half of Rodgers's tax-return volume.  Trial Tr.

23  (Rodgers) at 33:3-4.

24     16.     As a tax professional, Rodgers knows the following:

25          a.      As taxable income increases, tax increases.  Trial Tr. (Rodgers) at 17:6-

26                  7.

27          b.      As deductions increase, tax decreases.  Trial Tr. (Rodgers) at 17:8-10.

28          c.      Expenses can be deducted only once.  Trial Tr. (Rodgers) at 18:2-5.

1          d.     To claim a deduction, the expense must actually be incurred.  Trial Tr.
2                 (Rodgers) at 18:24-25.
3          e.     Personal expenses are not deductible by as business expenses.  Trial Tr.
4                 (Rodgers) at 40:2-8.
5     17.   As a tax professional, Rodgers understands that in the preparation of tax
6     returns:
7          a.     He has a duty not to ignore the implications of information furnished to
8                 him or actually known by him.  Trial Tr. (Rodgers) at 37:18-21.
9          b.     He must make reasonable inquiries if the information as furnished
10                appears to be incorrect or incomplete.  Trial Tr. (Rodgers) at 37:22-25.
11    18.   Regarding the preparation of corporate tax returns, Rodgers understands that:
12         a.     The multiple corporations with common owners increases the
13                complexity of the tax returns.  Trial Tr. (Rodgers) at 20:17-21:12.
14         b.     The presence of cash flows between such companies requires the tax
15                return preparer to make sure that the cash flows are properly accounted
16                for.  Trial Tr. (Rodgers) at 21:6-9.
17    19.   Ross and Keller owned and operated Rossmith in 2009 and 2010.  Ross Decl.
18    (Dkt. 55), ¶¶ 1, 4, 8, 9.
19    20.   Ross and Keller owned and operated Ross Pac in 2009 and 2010.  Ross Decl.
20    (Dkt. 55), ¶¶ 2, 5, 8, 10.
21    21.   Ross and Keller owned two-thirds of Freshtech and operated Freshtech in
22    2009 and 2010.  Ross Decl. (Dkt. 55), ¶¶ 3, 6-8, 10.
23    22.   Dana Styck is the bookkeeper/controller of Rossmith, Ross Pac, and Freshtech
24    and has been so since July 2009.  Styck Decl. (Dkt. 56), ¶¶ 1, 2.
25    23.   The bookkeeper/controller of Rossmith employed immediately before Styck
26    was previously employed by Rodgers.  Ross Decl. (Dkt. 55), ¶ 24; Trial Tr. (Styck) at 90:14-
27    16 & 20-24.
28

24. Before 2009, Rodgers was Ross's personal accountant and tax return preparer for many years. Ross Decl. (Dkt. 55), ¶ 14.

25. Before 2009, Rodgers was Rossmith's outside accountant and tax return preparer for many years. Ross Decl. (Dkt. 55), ¶ 14.

26. After Ross Pac was formed, Rodgers also served as the outside accountant and tax return preparer for Ross Pac. Ross Decl. (Dkt. 55), ¶ 16.

27. After Freshtech was formed, Rodgers also served as the outside accountant and tax-return preparer for Freshtech. Ross Decl. (Dkt. 55), ¶ 18.

28. Before 2009, Rodgers provided Ross with tax, accounting, and financial advice regarding Ross's businesses for many years. Ross Decl. (Dkt. 55), ¶ 19.

29. For example, in 2002, Rodgers advised Ross about the tax consequences of home office including what expenses are deductible and their placement on the tax return. Trial testimony (Rodgers) at 35:12-16, 42:7-20; Rodgers Decl. (Dkt. 60), ¶ 67.

30. Until 2012, Rodgers had prepared Ross's individual and Rossmith's corporate tax returns since the 1980s. Rodgers Decl., ¶ 30.

31. During 2009 and 2010, Keller owned a condominium in West Hollywood, California, referred to as the Kings Road Condo. Keller Dep. (Dkt. 42), 102:9-106:6.

32. Keller planned to use the Kings Road Condo for his business travel to the west coast. Keller Dep. (Dkt. 42), 102:9-106:6.

33. Keller told Rodgers of his plan for the Kings Road Condo in 2008 and provided to Rodgers a lease agreement dated March 2008 between himself and Rossmith regarding the Kings Road Condo. Exhibit 15; Rodgers Decl. (Dkt. 60), ¶¶ 60, 61; Keller Dep. (Dkt. 42), 102:9-106:6.

34. Keller changed his mind, however, and rented out the Kings Road Condo to an unrelated person. The Kings Road Condo was never used for business purposes. Keller Dep. (Dkt. 42), 102:9-106:6.

35. Although Keller never used the Kings Road Condo for business, Rossmith paid various expenses associated with the Kings Road condominium in 2009. Specifically,

in 2009 Rossmith paid a total of $50,565.98 for expenses associated with Keller's Kings Road Condo. Rossmith was reimbursed $1,831.35 by Freshtech and $19,582.96 by Ross Pac for those expenses. Keller Dep. (Dkt. 42), 103:24-25); Ex.126 at US001209.

36. Rossmith also paid various expenses associated with the Kings Road Condo in 2010. Specifically, in 2010 Rossmith paid a total of $55,013.08 toward Keller's Kings Road Condo. Rossmith was reimbursed $28,656.41 by Freshtech and $26,040.04 by Ross Pac for those expenses. Keller Dep. (Dkt. 42), 103:24-25; Ex. 127 at US001452-1453.

37. In addition, in 2009, Rossmith paid to Keller or on behalf of Keller, property taxes for the Kings Road Condo of $7,942.52. Styck Decl. (Dkt. 56), ¶20; Ex. 126 at US001197.

38. In addition, in 2010, Rossmith paid to Keller or on behalf of Keller, property taxes for the Kings Road Condo of at least $3,508.40. Styck Decl. (Dkt. 56), ¶20; Ex. 127 at US001441-42.

39. For purposes of preparation of his 2009 and 2010 personal tax returns, Keller provided to Rodgers's office a summary of his expenses for the Kings Road Condo. Troitskaya Decl. (Dkt. 58), ¶39; Ex. 56.

40. The 2009 profit-and-loss statements for Rossmith included an expense item of $29,161.57 for the Kings Road Condo. Ex. 145 at Rodgers_000958 ("Rent Kings Road Condo $29,161.57); Ex. 146 at Rodgers_000947; Ex. 235 at Rodgers_000934.

41. Keller's W-2 from Rossmith for 2009 did not include the $50,565.98 paid by Rossmith, Ross Pac, and Freshtech for expenses for the Kings Road Condo nor the property tax of $7,942.52. Ex. 21 at US003293; Ex. 63 at US003266; Ex. 126 at US001193-94.

42. Keller's W-2 from Rossmith for 2010 did not include the $55,013.08 paid by Rossmith, Ross Pac, and Freshtech for expenses for the Kings Road Condo nor the property tax of at least $3,508.40. Ex. 64 at US003328; Ex. 234 at Rodgers_001210; Ex. 127 at US001438.

43.     Since 2006, Rossmith, Ross Pac, and Freshtech share office space, office equipment, office supplies, and employees.  Ross Decl. (Dkt. 61), ¶ 27; Styck Decl. (Dkt. 56), ¶ 13.

44.     In addition, Rossmith, Ross Pac, and Freshtech share the expenses associated with the shared office space, office equipment, office supplies, and employees.  Rodgers Decl. (Dkt. 60), ¶¶ 43, 44; Styck Decl. (Dkt. 56), ¶14.

45.     Rossmith, Ross Pac, and Freshtech each maintain a separate general ledger as part of its normal bookkeeping practices.  Styck Decl. (Dkt. 56), ¶¶ 5-12; Styck Decl. (Dkt. 59), ¶ 7; Trial Tr. (Styck) at 71:3-4.

46.     A general ledger is a set of accounts providing a complete record of the financial transactions of a company.  Styck Decl. (Dkt. 56), ¶ 4.

47.     In the general ledger, the expenditures of the company are categorized into different categories, such as insurance, postage, telephone, and other designated categories.  Styck Decl., (Dkt. 56), ¶ 4; Trial Tr. (Rodgers) at 23:24-24:8.

48.     From the general ledgers, the total amount paid by Rossmith for different types of expenses may be determined.  Styck Decl. (Dkt. 56), ¶¶ 16-19.

49.     In addition, the amount of contribution to that expense from Ross Pac and Freshtech and the net amount paid by Rossmith for the expense categories may be determined from the general ledgers.  Styck Decl. (Dkt. 56), ¶¶ 16-19.

50.     Rodgers and Barbieri were familiar with and understood the procedures and financial records being used by Rossmith, Ross Pac, and Freshtech.  Barbieri Decl. (Dkt. 63), ¶¶ 27-29; Rodgers Decl. (Dkt. 60), ¶¶ 41-48, 77, 85.

51.     In 2007, Rodgers suggested that Rossmith, Ross Pac, and Freshtech enter into an agreement memorializing their cost-sharing arrangement.  Rodgers Decl. (Dkt. 60), ¶ 47.

52.     Rodgers knew of the cost-sharing arrangement between Rossmith, Ross Pac, and Freshtech in 2007.  Rodgers Decl. (Dkt. 60), ¶¶ 42-48.

53.     Generally speaking, the expenses of Rossmith, Ross Pac, and Freshtech are paid by Rossmith, although occasionally, Ross Pac and Freshtech paid their own expenses directly to vendors.  Styck Decl. (Dkt. 56), ¶ 14.

54.     Ross Pac and Freshtech occasionally paid to Rossmith lump-sum payments. Styck Decl. (Dkt. 56), ¶ 15; Ex. 128 at US000566.

55.     From the lump-sum payments from Ross Pac and Freshtech, Rossmith would allocate portions of the payment to various expenses.  Styck Decl. (Dkt. 56), ¶¶ 14, 15; Styck Decl. (Dkt. 59), ¶¶ 28, 29; Ex. 126.

56.     Typically, an accounting category designated as "suspense" is a temporary holding account for transactions that the bookkeeper needs further guidance from an accountant to categorize properly.  Trial Tr. (Rodgers) at 27:23-29:7).

57.     To a trained tax preparer such as Rodgers, a negative balance on a profit-and-loss statement signifies something amiss necessitating further inquiry by the preparer.  Trial Tr. (Rodgers) at 45:23-46:7.

58.     Clients would frequently contact Rodgers's office, and sometimes Rodgers himself for direction as to how to treat items placed in suspense accounts.  Trial Tr. (Rodgers) at 27-28.

59.     Rossmith, Ross Pac, and Freshtech each had a suspense account.  Trial Tr. (Styck) at 80:21-22.

60.     Barbieri directed Styck to rename the "suspense account" in Rossmith's general ledger as "corporate-operating expenses."  Barbieri Decl. (Dkt. 63), ¶ 29; Ex 34.

61.     The suspense account and the corporate-operating-expense account are the same thing.  Trial Tr. (Styck) at 81:17-22.

62.     Funds from Ross Pac and Freshtech that Rossmith did not allocate to a specific shared expense were allocated to an account designated the "suspense account."  For example, a March 20, 2009 check for $50,000 from Ross Pac, Rossmith allocated $8,775.06 to the suspense/corporate-operating-expense account.  Barbieri Decl. (Dkt. 63), ¶ 29; Ex. 126 at US001208-09.

63.     Amounts remaining in Rossmith's suspense account after expenses were allocated to a specific expense category was income to Rossmith.  Barbieri Decl. (Dkt. 63), ¶¶ 27-29; Styck Decl. (Dkt. 59), ¶¶ 28-31; Ex. 11 (Rodgers_002587); Ex. 12 (Rodgers_002590).

64.     Barbieri understood that merely transferring money from one company to another does not make the transfer a deductible expense.  Trial Tr. (Barbieri) at 184:19-24.

65.     Rodgers's general tax preparation procedure was to have an individual other than Mr. Rodgers or the initial tax return preparer review the tax return and raise any factual or legal questions.  Barbieri Decl. (Dkt. 63), ¶¶ 17-22; Rodgers Decl. (Dkt. 60), ¶¶ 19-23; Troitskaya Decl. (Dkt. 58), ¶¶ 11-15.

66.     For the 2009 and 2010 tax returns for Ross, Keller, Rossmith, Ross Pac, and Freshtech, Troitskaya was the initial preparer.  After Troitskaya completed her tasks regarding the 2009 and 2010 tax returns for Ross, Keller, Rossmith, Ross Pac, and Freshtech, the returns were given directly to Rodgers for tax review.  Barbieri reviewed the accounting for the corporate return.  Rodgers Decl. (Dkt. 60), ¶¶ 74, 77.

67.     Troitskaya viewed the preparation of the tax returns for Rossmith, Ross Pac, and Freshtech as very complex.  Troitstkaya agreed that she had never before seen returns like the returns for Ross, Keller, Rossmith, Ross Pac, and Freshtech.  Trial Tr. (Troitskaya) at 152:22-153:9.

68.     In the preparation of the corporate tax returns, neither Rodgers nor Troitskaya reviewed the general ledgers of the companies.  Rodgers Decl. (Dkt. 60), ¶ 80.

69.     There was no impediment to Rodgers requesting the general ledgers of the companies had he chosen to do so.  Trial Tr. (Rodgers) at 30:2-10.  But Rodgers did not, and would not request the general ledgers "unless there's a reason," because it is not cost effective.  Trial Tr. (Rodgers) at 30:15-18 ("We try to be cost effective.  The entire set of the returns-of seven returns, including three individuals, cost about 6700 bucks.  We can't get that done and look at the general ledgers unless there's a reason.").

70.     Rodgers and his staff would suggest modifications for Styck to make to the profit-and-loss statements.  Styck also made changes to the general ledger at the direction of Rodgers and his staff.  Styck Decl. (Dkt. 56), ¶¶ 21, 23, 24; Barbieri Decl. (Dkt. 63), ¶ 29; Ex. 126 at US001001; Ex. 128, US000703, 724, 731; Trial Tr. (Rodgers) at 39:4-6 ("If it's a corporate return, we suggest the corrections to the account balances and we get a new P&L to support the tax return as it would then appear."); 47:2-10); 52:11-15; 53:13-17 ("We would determine them by-you know, Ramon might consult on the financials.  I might be involved in an adjustment.  Alla might know enough to make the call on it herself.").

71.     The 2009 and 2010 profit-and-loss statement for Rossmith had no fewer than four iterations.  Exs. 110, 145, 146, 147, 150, 151, 152, 154, 162, 165, 235, 237, 240.

72.     The iterations were necessary because the initial profit-and-loss statements had negative balances indicating that income and expense items were not adequately characterized.  Trial Tr. (Rodgers) at 51:17-52:18.

73.     Despite the apparent difficulties Rossmith and Ross Pac experienced in attempting to characterize income and expense items, Rodgers did not ask for supporting documentation.

74.     On January 30, 2009, Ross Pac wrote a $212,000 check to Rossmith.  In its general ledger, Ross Pac entered this check in the account category designated as "suspense."  Rossmith entered this check in its general ledger in an account category designated as "corporate operating expense."  Exhibit 126, US000943, US001208. Ex. 128, US000565, 731.

75.     Styck recharacterized the $212,000 entry in the Ross Pac general ledger from the suspense account category to the costs-of-goods sold account category at the direction of John Q. Rodgers Law Corporation.  There is no evidence that Ross Pac purchased $212,000 of goods from Rossmith.  Styck Decl. (Dkt. 56), ¶¶31-32; Ex. 128, US000703, 731.

76.     The costs-of-goods-sold category is for direct expenses of the corporation in the production of goods, such as direct material costs, direct labor costs, and the purchase of assembled materials.  Trial Tr. (Rodgers) at 18:6-9.

77.     Expenses that are not directly related to the costs of goods sold are not supposed to be included in the costs-of-goods-sold category.  Administrative, office, and sales expenses are supposed to be recorded in categories other than the costs-of-goods-sold category.  Trial Tr. (Rodgers) at 18:6-9 & 18:16-23.

78.     Regarding the $212,000 entry in the Rossmith general ledger in the corporate-operating expense account category, it was included in the total amount of negative $422,959.27 in that category.  Ex. 126, US001208-09.

79.     Ross hired and paid Rodgers to prepare his 2009 and 2010 federal income-tax returns.  Rodgers signed Ross's 2009 and 2010 federal income-tax return as the preparer.  Ross Decl. (Dkt. 55), ¶ 12; Ex. 21, US003292; Ex. 256, US000046.

80.     For Ross's 2009 and 2010 tax returns, Rodgers did not apply the home-mortgage-interest limitation contained in IRC § 163(h)(3) to Ross's home-mortgage interest although the limitation was applicable.  Nguyen Decl., ¶¶ 6-19, 2-23; Troitskaya Decl., ¶¶ 46-48; Rodgers Decl., ¶¶ 93-95.

81.     At the time that Rodgers completed Ross's 2009 and 2010 tax returns, Rodgers knew of the home-mortgage-interest limitation contained in IRC § 163(h)(3). As a consequence, Ross's 2009 and 2010 returns understated tax.  Nguyen Decl. (Dkt. 97), ¶¶ 6-19; Troitskaya Decl. (Dkt. 58), ¶¶ 46-48; Rodgers Decl. (Dkt. 60), ¶¶ 93-96.

82.     In 2009 and 2010, Ross had a home office, which consisted of no more than about 650 square feet of his 4,000 square-foot home.  The home office therefore constituted about 16.25% of Ross's home.  Ross Decl. (Dkt. 55), ¶¶ 27-28.

83.     Although Rodgers knew that Ross had a home office, Rodgers did not know the square footage of the house or office, even though those measurements are used by tax preparers to determine the allocation of expenses to the home office.  Rodgers Decl. (Dkt. 60), ¶¶ 63, 65-67; Trial Tr. (Rodgers) at 33:18-20, 55:19-24.

84.     When he signed Ross's 2009 and 2010 tax returns, Rodgers did not view it as part of his job to know the square footage of Ross's home office and simply assumed his office knew that information.  Troitskaya, however, testified that she relied on Rodgers to

determine the percentage allocation of the home expenses to the home office. Trial Tr. (Troitskaya) at 166:23-167:6 ("Q: How did you know how much to allocate between the two? A: "I asked John-John Rodgers if it's 80/20 percent, 80 percent for schedule A, 20 percent for business use of home, like rental."); Trial Tr. (Rodgers) at 36:21-37:4 ("It wouldn't' be part of my job to trace that down. I don't prepare the returns.").

85.     Neither Ross nor Styck recollect being contacted by anyone at John Q. Rodgers Law Corporation regarding any questions about expenses pertaining to Ross's home office of the allocation between personal expenses and those pertaining to his home office for tax years 2009 and 2010. Ross Decl. (Dkt. 55), ¶ 29; Styck Decl. (Dkt. 56), ¶ 36.

86.     On Ross's 2009 tax return, $6,275 is claimed for advertising expenses for the home office, $4,550 is claimed for legal and other professional expenses pertaining to the home office, $8,918 is claimed for cleaning and maintenance attributable to the home office, and $3,214 is claimed for gardening attributable to the home office. On Ross's 2010 tax return, $2,235 is claimed for legal and professional expenses pertaining to the home office, $2,367 is claimed for cleaning and maintenance attributable to the home office, and $2,400 is claimed for gardening attributable to the home office. Ross does not recollect having any advertising expenses or legal and other professional expenses for his home office in 2009 and 2010, and his expenses for cleaning, maintenance, gardening, tree trimming, and pool maintenance for his home for those years were about $10,200. Ex. 21, US003299; Ex. 256, US 000054; Ross Decl. (Dkt. 55), ¶¶ 30-33.

87.     Allocating 16.25% of the cleaning and maintenance expenses and the gardening expenses (even assuming that all of those expenses (such as pool maintenance) could be allocated to the home office) and comparing those to the expenses claimed on the return, and accounting for the deduction for non-existent advertising, legal, and professional expenses, results in an overstatement of deductions, and corresponding understatement of Ross's tax liability of, at a minimum, $21,209.50 in 2009 and $3,822.50 in 2010. Nguyen Decl. (Dkt. 97), ¶¶ 6-32; Troitskaya Decl. (Dkt. 58), ¶¶ 46-48; Rodgers Decl. (Dkt. 60), ¶¶ 93-99.

88. Keller hired and paid Rodgers to prepare his 2009 and 2010 federal income-tax returns. Rodgers signed Keller's 2009 and 2010 federal income-tax returns as the preparer. Rodgers Decl. (Dkt. 60), ¶ 82; Ex. 63, US003264; Ex. 64, US003326.

89. For Keller's 2009 and 2010 returns, Rodgers did not apply the passive-activity-loss limitation contained in IRC § 469 to Keller's passive-activity losses although the limitation was applicable. Nguyen Decl. (Dkt. 97), ¶¶ 33-36; Troitskaya Decl. (Dkt. 58), ¶¶ 43-45; Rodgers Decl. (Dkt. 60), ¶¶ 88-90.

90. At the time that Rodgers completed Keller's 2009 and 2010 returns, Rodgers knew of the passive-activity-loss limitation contained in IRC § 469. As a consequence, Keller's 2009 and 2010 returns understated tax. Nguyen Decl. (Dkt. 97), ¶¶ 6-19; Troitskaya Decl. (Dkt. 58), ¶¶ 43-45; Rodgers Decl. (Dkt. 60), ¶¶ 88-91.

91. In 2009, Rossmith paid $58,508.50 either directly to Keller or on behalf of Keller related to Keller's Kings Road Condo rental property. In 2010, Rossmith paid at least $58,521.48 either directly to Keller or on behalf of Keller related to Keller's Kings Road rental property. Keller Dep. (Dkt. 42) at 103:24-25; Ex. 126, US001209; Ex. 127, US 001452-1453. Rodgers did not report these amounts as income on Keller's 2009 and 2010 returns. Ex. 63, US003263; Ex. 64, US003325.

92. In 2009, Keller claimed deductions of $40,543 for mortgage, $5,902 for HOA dues, and $7,943 for taxes for the Kings Road Condo rental. In 2010, Keller claimed deductions of $40,543 for mortgage, $5,903 for HOA dues, and $7,943 for taxes for the Kings Road Condo rental. Ex. 63, US003273; Ex. 64, US003336; Troitskaya Decl. (Dkt. 58), ¶ 39; Ex. 56; Ex. 72.

93. In 2009, Rossmith paid a total of $29,161.67 (after consideration of the reimbursement it received from Ross Pac and Freshtech) for mortgage and HOA expenses for Keller's Kings Road rental property. Keller Dep. (Dkt. 42) at 103:24-25; Ex. 126, US001209. The $29,161 was included in the $108,516 that Rossmith claimed as a rent expense on its 2009 tax return. Rossmith included the $7,942.52 it paid for the King's Road

property taxes in the $173,803 it claimed as a deduction for taxes and licenses for 2009. Ex. 41, US003683; Ex. 235, Rodgers_000934-935.

94. In 2010, in addition to the amounts Rossmith paid to Keller related to the Kings Road rental property, Rossmith paid $326.64 (after consideration of the reimbursement it received from Ross Pac and Freshtech) for expenses associated with the Kings Road rental property. Ex. 127, US001453. The $326 was included in the $58,792 that Rossmith claimed as a rent expense on its 2010 tax return. Ex. 116, US002525 (line 16); Ex. 235, Rodgers_001005-1006 (total rent expense of $58,792 includes $326.64 for "Kings Road Condo").

95. Rossmith hired and paid Rodgers to prepare its 2009 and 2010 federal income tax returns. Ross Decl. (Dkt. 55), ¶ 11. Rodgers signed the Rossmith 2009 and 2010 tax returns as the return preparer. Ex. 41; Ex. 116.

96. Rossmith's 2009 tax return:

    a. Understated total income (line 11) by not including money it received from Ross Pac and Freshtech that was not allocated as reimbursement by Rossmith to a shared expense.

    b. Overstated the salaries-and-wages deduction (line 13) by including amounts for which it received reimbursement.

    c. Overstated the taxes-and-licenses deduction (line 17) by including amounts for which it received reimbursement.

    d. Overstated advertising deduction (line 22) by including non-deductible country-club dues.

    e. Claimed deductions related to Keller's King's Road Condo rental property that were also claimed by Keller on his personal returns and that, in any event, were not business-related expenses.

97. In 2009, Rossmith received $422,969.27 from Ross Pac and Freshtech that was not allocated to any shared expense, as reflected by the negative balance in the

corporate-operating-expense account.  Ex. 126 at US001208; Barbieri Decl. (Dkt. 63), ¶ 29; Styck Decl. (Dkt. 59), ¶ 30.

98.    Such transfers above the allocated shared expenses is income to Rossmith. IRC § 61; Barbieri Decl. (Dkt. 63), ¶¶ 27-29; Styck Decl. (Dkt. 59), ¶¶ 28-31; Ex. 11 (Rodgers_002587); Ex. 12 (Rodgers_002590).

99.    Despite Barbieri's knowledge that a negative balance in the corporate-operating expense category was income to Rossmith, it was not reported as income on Rossmith's 2009 and 2010 returns.  This is shown by the absence of the negative corporate-operating-expense account in the computation of the gross receipts reported on the tax return.  Other than gross receipts, no other income items are reported on Rossmith's 2009 return.  Thus, Rossmith did not include as income the $422,959.27 in transfers from Ross Pac and Freshtech that exceeded their reimbursement payments for shared expenses.  Absent any other adjustments, an understatement of total income by $422,959.27 yields an understatement of taxable income by that amount which yields an understatement of tax. Ex. 41; Ex. 116.

100.    On its 2009 tax return, Rossmith Packaging claimed a deduction for salaries and wages (not including compensation for officers which is reported at line 12) of $273,526.  Ex. 41 (line 13).  According to its 2009 general ledger, Rossmith paid a total of $65,360.65 in salaries for 2009 after consideration of reimbursement received from Ross Pac and Freshtech.  Ex. 126, US001191-1193.

101.    According to its 2009 general ledger, Rossmith paid a total of $56,052.43 in "services/consulting/1099" for 2009 after consideration of reimbursement received from Ross Pac and Freshtech.  Ex. 126 at US001194-1195.  Therefore, for 2009, Rossmith paid a total of $121,413.08 for salaries and "services/consulting/1099" for 2009 after consideration of reimbursement received from Ross Pac and Freshtech.  ($65,360.65 + $56,052.43 = $121,413.08).  Rossmith's tax return for 2009 overstates its expenses for salaries and "services/consulting/1099" by $152,112.92 (Amount claimed of $273,526 minus actual amount expended per general ledger of $121,413.08).

102.    On its 2009 tax return, Rossmith Packaging claimed a deduction for taxes and licenses of $173,803.  Ex. 41.  The taxes claimed include Keller's King's Road Condo rental property, which he owns and rents, for which he also claimed a deduction.  Styck Decl. (Dkt. 56), ¶ 20; Ex. 126, US001197; Ex. 63, US003273.  Rossmith overstated its deduction for taxes and licenses by $88,694.49.  Amount claimed of $173,803 minus total paid for taxes and licenses (less Keller's property taxes) of $85,108.51 equals $88,694.49.

103.    Rossmith paid total dues and subscriptions in 2009 of $11,569.46.  Ex. 126, US001159-60.  This amount included $4,085 in membership dues that Rossmith paid to Manhattan Beach Country Club.  Styck Decl. (Dkt. 56), ¶ 18; Ex. 126, US001159-60.  For 2009, Rossmith received reimbursement for dues and subscriptions from Freshtech and Ross Pac, in the total amount of $4,230.89, leaving a balance of $7,338.57.  Ex. 126.  Of the $11,569.46 total dues and subscription, Rossmith's allocated portion was 63.43%.  ($7,338.57 / $11,569.46 = .6343).  Therefore, of the $5,047.49 that Rossmith total paid for membership dues at Manhattan Beach Country Club, $3,201.62 was Rossmith's allocated portion.  ($5,047.49 x .6343 = $3,201.62).

104.    All versions of Rossmith's profit-and-loss statements for 2009 reflected expenses for dues and subscriptions of $7,338.57.  Ex. 145, Rodgers_000957; Ex. 146, Rodgers_000946; Ex. 147, US000914; Ex. 235, Rodgers_000934.  In the final version of Rossmith's profit-and-loss statement for 2009, next to the $7,338.57 entry for dues and subscriptions, Troitskaya wrote "advertising."  Ex. 235, Rodgers_000934.  On its 2009 tax return, Rossmith claimed a deduction for advertising of $7,339.  Ex. 41, US003683.

105.    The membership dues for the Manhattan Beach Country Club were not deductible by Rossmith.  IRC § 274(a)(3).  The membership dues for Manhattan Beach Country Club were not included in Ross's or Keller's reported wages from Rossmith.  Ex. 21; Ex. 63.

106.    As set forth in paragraphs 91 to 94 above, Rossmith claimed deductions on its 2009 tax return that were also claimed by Keller.  In addition to claiming the same

deductions as Keller for the Keller's Kings Road Condo rental property, those expenses were unrelated to Rossmith's business. Keller Dep. (Dkt. 42) at 103:24-25.

107. Rossmith's 2010 tax return:

    a.    Understated total income (line 11) by not including money it received from Ross Pac and Freshtech that was not allocated as reimbursement by Rossmith to a shared expense.

    b.    Overstated the deduction for dues and subscriptions (line 26 / statement 1) by including non-deductible country-club dues.

    c.    Claimed deductions related to Keller's King's Road Condo rental property that were also claimed by Keller on his personal returns and that, in any event, were not business-related expenses.

108. In 2010, Rossmith received $498,641.85 from Ross Pac and Freshtech that was not allocated to any shared expense, as reflected by the negative balance in the corporate-operating-expense account. Ex. 127, US001452; Barbieri Decl. (Dkt. 63), ¶29; Styck Decl. (Dkt. 59), ¶ 30. Absent any other adjustments, an understatement of total income by $498,641.85 yields an understatement of taxable income by that amount which yields an understatement of tax. Ex. 116.

109. Rossmith paid total dues and subscriptions in 2010 of $9,543.79, before consideration of reimbursement from Ross Pac and Freshtech. Ex. 127, US001412-13. This amount included $4,085 in membership dues that Rossmith paid to Manhattan Beach Country Club. Styck Decl., (Dkt. 56), ¶ 18; Ex. 127, US001412-13. For 2010, from Freshtech and Ross Pac, Rossmith received reimbursement for dues and subscriptions in the total amount of $7,481.83, leaving a balance of $2,061.96. Ex. 127, US001412-13. Of the $9,543.79 total dues and subscription, Rossmith's allocated portion was 21.6%. ($2,061.96 / $9,543.79 = .2160). Therefore, of the $2,061.96 that Rossmith total paid for membership dues at Manhattan Beach Country Club, $445.38 was Rossmith's share. ($2,061.96 x .216 = $445.38).

110.    All versions of Rossmith's profit-and-loss statements for 2010 reflected expenses for dues and subscriptions of $2,061.96.  Ex. 165, Rodgers_002403; Ex. 237, Rodgers_001005; Ex. 162, Rodgers_000331; Ex. 110, Rodgers_002484.  On its 2010 tax return, Rossmith claimed a deduction for dues and subscriptions of $2,062.  Exhibit 116 at US002525 (line 26), 2534 (statement 1).

111.    The membership dues for the Manhattan Beach Country Club were not deductible by Rossmith.  IRC § 274(a)(3).  The membership dues for Manhattan Beach Country Club were not included in Ross's or Keller's reported wages from Rossmith.  Ex. 64; Ex. 256.

112.    As set forth in paragraphs 91 to 94 above, Rossmith claimed deductions on its 2010 tax return that were also claimed by Keller.  In addition to claiming the same deductions as Keller for the Keller's Kings Road Condo rental property, those expenses were unrelated to Rossmith's business.  Keller Dep. (Dkt. 42) at 103:24-25.

113.    Ross Pac hired and paid Rodgers to prepare its 2009 and 2010 federal income tax returns.  Freshtech hired and paid Rodgers to prepare its 2010 federal income tax return.  Ross Decl. (Dkt. 55), ¶ 11.  Rodgers signed the Ross Pac 2009 and 2010 and Freshtech 2010 tax returns as the return preparer.  Ex. 25; Ex. 118; Ex. 239.

114.    Ross Pac's 2009 tax return overstated its deduction for salaries.  Specifically, while the tax return reflects that Ross Pac paid $233,038 for contract services, employees, officers, and other salaries (which were reported on line 2 (costs-of-goods sold) of the tax return instead of lines 12 (compensation of officers) and 13 (salaries and wages)), the general ledger reflects expenses in these categories of only $203,122.34 of which $202,402.34 was paid to Rossmith.  Ex. 150; Ex. 128, US000728-730.  In addition, Rossmith's 2009 general ledger reflects that Rossmith paid $216,610.88 in officer's salaries and received no reimbursement for these payments from Ross Pac and Freshtech.  Ex. 126, US001193-1194.

115.    On its 2009 tax return, Rossmith claimed a deduction for compensation to officers of $217,608.  Ex. 41, US003683.  Rossmith therefore paid the entirety of the

-18-

officers' salaries and claimed the full deduction for those salaries, but Ross Pac also claimed an $86,841.42 deduction for officer's salaries, which was placed in the costs-of-goods-sold category on its tax return. Ex. 41, US003683; Ex. 128, US000728-730; Ex. 150, Rodgers_001939; Ex. 239, Ross_00274, Ross_00278.

116. Reducing line 2 (costs of goods sold) on the tax return by $86,841.02 (the officers' salaries that were not incurred) and by $29,915 (the "salaries-other" for which there is no support) increases Ross Pac's total income by that amount which, in turn, increases Ross Pac's taxable income by that amount and, as a consequence, increases Ross Pac's total tax. IRC § 1 (computing tax as a percentage of taxable income); Ex. 239, Ross_00273.

117. On its 2009 tax return, Ross Pac overstated its costs-of-goods sold by including the $212,000 transfer to Rossmith. Ross Pac's general ledger reflects total costs of goods of $3,976,920.13. Ex. 128, US000703-704. This account category includes a line entry that states: "Per JR move from suspense monies  Suspense  $212,000." Ex. 128, US000703. There is no evidence that Ross Pac purchased $212,000 of goods from Rossmith in 2009. Styck Decl. (Dkt. 56), ¶ 32. Rossmith did not allocate the $212,000 to any expenses it incurred on Ross Pac's behalf. Ex. 126, US001208. Reducing line 2 (costs of goods sold) on the tax return by $212,000 increases Ross Pac's total income by that amount, which, in turn, increases Ross Pac's taxable income by that amount and, as a consequence, increases Ross Pac's total tax. IRC § 1 (computing tax as a percentage of taxable income); Ex. 239, Ross_00273.

118. On its 2009 tax return, Ross Pac overstated its costs-of-goods sold by including $2,712.71 for payroll-tax expenses, which it did not incur. Ross Pac's 2009 general ledger includes an entry in the costs-of-goods-sold account that states "Adjust per JR as labor as monies pd / payroll taxes $71,485.30." Ex. 128, US000703. In 2009, Ross Pac had only reimbursed Rossmith for $68,772.59. Ex. 126, US001172-1181. Thus, Ross Pac overstated the amount it reimbursed Rossmith for payroll taxes by $2,712.71. ($71,485.30 - $68,772.59 = $2,712.71). Reducing line 2 (costs of goods sold) on the tax return by $2,712.71 increases Ross Pac's total income by that amount which, in turn, increases Ross

Pac's taxable income by that amount and, as a consequence, increases Ross Pac's total tax. IRC § 1 (computing tax as a percentage of taxable income); Ex. 239, Ross_00273.

119. Ross Pac's and Freshtech's 2010 tax returns:

    a.    Overstate rental expenses.

    b.    Overstate expenses for dues and subscriptions.

    c.    Overstate expenses for supplies, repairs, and maintenance.

120. Comparing the amount of rent claimed as deductions on line 16 of their 2010 tax returns, Rossmith (Ex. 116), Ross Pac (Ex 118), and Freshtech (Ex. 25) with the amount of actual rent paid as reflected in Rossmith's 2010 general ledger (Ex 127), shows that while Rossmith, Ross Pac, and Freshtech collectively paid only $203,725.15 in rent expenses, they collectively claimed deductions for rent of $303,696. Ex. 127, US001433-1453. Specifically, Ross Pac overstated its rental deduction on its 2010 tax return by $63,432.76, and Freshtech overstated its rental deduction on its 2010 tax return by $48,091.88. Reducing the rental deductions claimed by Ross Pac and Freshtech by these amounts correspondingly increases their taxable income and total tax.

121. Additionally, as set forth in paragraphs 91 to 94 above, the rental deductions Ross Pac and Freshtech claimed on their 2010 tax returns included a portion of the deduction associated with Keller's Kings Road rental property that was also claimed by Keller. In addition to claiming the same deductions as Keller for the Keller's Kings Road rental property, those expenses were unrelated to the business of Rossmith, Ross Pac, and Freshtech. Keller Dep. (Dkt. 42) at 103:24-25.

122. In 2010, Rossmith paid a total of $9,543.79 for dues and subscriptions, including the non-deductible expenses for the Manhattan Beach Country Club. Ex. 127, US001412-1413; IRC § 274(a)(3). Of this $9,543.67, Ross Pac reimbursed Rossmith $2,646.25 and Freshtech reimbursed Rossmith $4,835.58 for total reimbursements of $7,481.83. Ex. 127, US001412-1413.

123. On its 2010 tax return, Ross Pac claimed a deduction of $4,922 for dues and subscriptions, thereby overstating its deduction by at least $2,275.75. Ex. 118, US002510

(line 26), US002517 (statement 1) ($4,922 - $2,646.25 = $2,275.75). On its 2010 tax return, Freshtech claimed a deduction of $5,659 for dues and subscriptions, thereby overstating its deduction by at least $823.42. Ex. 25, US001812 (line 26); US001821 (statement 1) ($5,659 - $4,835.58 = $823.42). In addition, the amount that Ross Pac and Freshtech could claim for these deductions would be further reduced because about 43% ($4,085 / $9,543.79 = .428) of the dues that Rossmith paid were for dues for Manhattan Beach Country Club, which are not deductible. Ex. 127, US001412-13.

124. Comparing the amount contributed by Ross Pac to Rossmith for supplies based on Rossmith's 2010 general ledger (Ex. 127, US001339-1441) with the amount of payments from Ross Pac to Rossmith in Ross Pac's general ledger (Ex. 129, US000842-843) and Ross Pac's March 3, 2011 profit-and-loss statement (Ex. 242) shows that while Rossmith's general ledger reflects that Ross Pac contributed only $7,153.76 toward the actual expenses for supplies, repairs, and maintenance, Ross Pac's general ledger claimed $20,124.97 payments to Rossmith for supplies, repairs, and maintenance while its profit-and-loss statement claimed payments of $17,124.97 in payments to Rossmith for supplies, repairs, and maintenance.

125. Comparing the amount contributed by Freshtech to Rossmith for supplies based on Rossmith's 2010 general ledger (Ex. 127, US001439-1441) with the amount of payments from Freshtech to Rossmith in Freshtech's general ledger (Ex. 131, US002100-2101) and Freshtech's March 8, 2011 profit-and-loss statement (Ex. 171) shows that while Rossmith's general ledger reflects that Freshtech contributed only $2,261.98 towards the actual expenses for supplies, repairs, and maintenance, Freshtech's general ledger and its profit-and-loss statement claimed $9,696.16 in payments to Rossmith for supplies, repairs, and maintenance.

126. Comparing the amounts claimed as deductions for supplies, repairs, and maintenance on lines 14 and 20 (statement 1) of their 2010 tax returns, Rossmith (Ex. 116), Ross Pac (Ex. 118), and Freshtech (Ex. 25) with the actual amount paid for supplies, repairs, and maintenance paid as reflected in Rossmith's 2010 general ledger (Ex. 127,

US001433-1437) shows that Ross Pac overstated its deductions for supplies, repairs, and maintenance on its 2010 tax return by $9,971.24, and that Freshtech overstated its deductions for supplies, repairs, and maintenance on its 2010 tax return by $7,624.02. This also shows that while Rossmith, Ross Pac, and Freshtech collectively paid only $17,595.26 for supplies, repairs, and maintenance, they collectively claimed deductions for supplies, repairs, and maintenance of $29,945. Reducing the deductions by these amounts increases the taxable income and total tax of Rossmith, Ross Pac, and Freshtech.

## **Conclusions of Law**

1.     Through IRC § 6694, Congress imposed penalties on tax return preparers who understate a taxpayer's tax liability.

2.     Section 6694(b) imposes liability for understatements due to a tax return preparer's willful or reckless conduct.

3.     The elements for liability under IRC § 6694(b) are:

    a.     Rodgers is a tax return preparer as defined in IRC § 7701(a)(36);

    b.     The tax returns prepared by Rodgers contained an understatement of tax liability due to Rodgers's conduct; and

    c.     Either

        i.     Rodgers's conduct in the preparation of the tax return was a willful attempt in any manner to understate the liability for tax on the return; or

        ii.     Rodgers recklessly or intentionally disregarded the applicable rules and regulations resulting in the understatement.

4.     Under IRC § 7701(a)(36), a tax-return preparer is defined as any person who prepares for compensation, or who employs one or more persons to prepare for compensation, any return of tax imposed under Title 26.

5.     The Treasury Regulations state that "a preparer is considered to have recklessly or intentionally disregarded a rule or regulation if the preparer takes a position on the return or claim for refund that is contrary to a rule or regulation … and the preparer

knows of, or is reckless in not knowing of, the rule or regulation in question." 26 C.F.R. § 1.6694-3(b).

6.   The Treasury Regulations also state that "a preparer is reckless in not knowing of a rule or regulation if the prepare makes little or no effort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable preparer would observe in the situation." 26 C.F.R. § 1.6694-3(c)(1).

7.   Accordingly, if the preparer knew of the rule and did not apply the rule, then he is liable for the penalty under IRC § 6694(b)(2)(B).

8.   According to the Treasury Regulations:

> The tax return preparer generally may rely in good faith without verification upon information furnished by the taxpayer. . . .  The tax return preparer is not required to audit, examine or review books and records, business operations, documents, or other evidence to verify independently information provided by the taxpayer, advisor, other tax return preparer, or other party.  The tax return preparer, however, may not ignore the implications of information furnished to the tax return preparer or actually known by the tax return preparer.  The tax return preparer must make reasonable inquiries if the information as furnished appears to be incorrect or incomplete.

26 C.F.R. § 1.6694-1(e)(1).

9.   The preponderance-of-the-evidence standard applies to the penalty provisions of IRC § 6694(b).  See Herman & MacLean v. Huddleston, 459 U.S. 375, 389, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983); United States v. Kapp, 564 F.3d 1103, 1109 (9th Cir. 2009).

10.  The definition of willfulness under IRC § 6694(b)(2)(A), which is not otherwise defined by the statue, includes reckless disregard.  See Safeco Ins. Co. v. Burr, 551 U.S. 47, 57, 127 S. Ct. 2201, 167 L. Ed. 2d 1045 (2007) ("We have said before that

'willfully' is a 'word of many meanings whose construction is often dependent on the context in which it appears,' and where willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well.") (quoting Bryan v. United States, 524 U.S. 184, 191, 118 S. Ct. 1939, 141 L. Ed. 2d 198 (1998)).

11. Under the Internal Revenue Code, "gross income means all income from whatever source derived" except as otherwise provided by the Code.  IRC § 61(a).

12. "Because tax deductions are a matter of legislative grace, statutes providing for them should be narrowly construed."  Strange v. Commissioner, 270 F.3d 786, 787 (9th Cir. 2001).

13. Double deductions are not allowed for the same economic loss.  Charles Ilfeld Co. v. Hernandez, 282 U.S. 62, 68, 54 S. Ct. 596, 78 L. Ed. 1127 (1934) (absent clear Congressional intent, double deductions are not allowed); Marwais v. Commissioner, 354 F.2d 997, 998-999 (9th Cir. 1965).

14. A taxpayer may not deduct expenses for which it has been reimbursed or for which it has a right to reimbursement.  Glendinning, McLeash & Co., v. Commissioner, 61 F.2d 950, 952 (2d Cir. 1932); Estate of Boyd v. Commissioner, 28 T.C. 564, 566 (T.C. 1957) ("It is well settled that expenses for which there exists a right of reimbursement are not ordinary and necessary business expenses[.]").

15. Absent a business purpose, the payment of personal expenses by a corporation on behalf of its shareholders is not deductible to the corporation and is a constructive dividend to the shareholder.  Dobbe v. Commissioner, 61 Fed. App'x 348, 349 (9th Cir. 2003)

16. Section 274(a)(3) of the Internal Revenue Code provides that "no deduction shall be allowed … for amounts paid or incurred for membership in any club organized for business, pleasure, recreation, or other social purpose."  This prohibition includes dues for country clubs.  26 C.F.R. § 1.274-2(a)(iii) (clubs organized for business, pleasure, recreations, or other social purposes include country clubs).

17.     Partners are agents of each other and one's knowledge is imputed to the other. Friend v. H.A. Friend & Co., 416 F.2d 526, 533 (9th Cir. 1969) ("Well established concepts of partnership doctrine impute the knowledge and actions of one partner to all others.").

18.     Rodgers is a tax-return preparer under IRC § 7701(a)(36) of the Internal Revenue Code for the 2009 and 2010 tax returns of Ross, Keller, Rossmith, and Ross Pac, and the 2010 tax return of Freshtech.

19.     Rodgers willfully understated the tax on Ross's 2009 and 2010 tax returns or, alternatively, recklessly or intentionally disregarded the home-mortgage-interest limitation when preparing the return.

20.     The 2009 and 2010 Ross tax returns prepared by Rodgers contained an understatement of tax as reflected by the following:

      a.     The tax returns did not apply the mortgage-interest-limitation for loans over $1,000,000.

      b.     The tax returns claimed deductions for Ross's home office for which Ross had no expenses for at least the claimed advertising expenses and legal and other-professional expenses.

      c.     The tax returns claimed deductions for personal expenses by overstating the home-office's portion of the expenses in at least the cleaning-and-maintenance expenses and the gardening expenses.

21.     Rodgers willfully understated the tax on Ross's 2009 and 2010 tax returns as reflected by the following:

      a.     Rodgers had knowledge of the home-mortgage-interest limitation and did not apply it despite the amount of the claimed home-mortgage interest being in excess of $78,000, which should have caused him to inquire as to the amount of the home mortgage.

            i.     The fact that Rodgers made the same mistake in both 2009 and 2010 causes the Court to conclude that Rodgers willfully understated the tax and reject the explanation offered by Rodgers

that although Rodgers knew of the deduction limitation, he "inadvertently" missed the issue. The Court concludes that the explanation offered by Rodgers is not credible.

    ii.        The Court additionally concludes that Rodgers understated the tax on Ross's 2009 and 2010 tax returns by recklessly or intentionally disregarding the home-mortgage-interest limitation as reflected by the following:

           (1)    Rodgers knew of the home-mortgage-interest limitation and did not apply it.

           (2)    The amount of interest claimed should have alerted Rodgers to the possible application of the rule.

   b.      Rodgers claimed deductions for categories of expenses that are not facially related to home offices such as advertising expenses and legal and professional expenses.

   c.      Ross did not, in fact, incur advertising expenses or legal and professional expenses relating to his home office.

   d.      Neither Rodgers nor his associates made any inquiries to Ross or Styck regarding these implausible expenses.

   e.      Regarding categories of expenses such as gardening, cleaning, and maintenance that, although plausibly may be related to the home office, Rodgers claimed expenses in amounts that were in excess of an amounts that were allocable to those categories.

   f.      Neither Rodgers nor his associates made any inquiries to Ross or Styck regarding the proper allocation of these facially personal expenses, only a portion of which might be plausibly allocated to the home office.

22.    Rodgers willfully understated the tax on Keller's 2009 and 2010 tax returns or, alternatively, recklessly or intentionally disregarded the passive-activity-loss limitation when preparing the returns.

23. The 2009 and 2010 Keller tax returns prepared by Rodgers contained an understatement of tax as reflected by the following:

    a. The tax returns did not apply the passive-activity-limitation.

    b. The tax returns did not report as income Keller money paid by Rossmith for expenses associated with Keller's Kings Road Condo rental property.

    c. The tax returns claimed deductions that were also claimed by Rossmith.

24. Rodgers willfully understated the tax on Keller's 2009 and 2010 tax returns as reflected by the following:

    a. Rodgers knew of the passive-activity-loss limitation and did not apply it.

        i. The fact that Rodgers made the same mistake in both 2009 and 2010 causes the Court to conclude that Rodgers willfully understated the tax and reject the explanation offered by Rodgers that although Rodgers knew of the deduction limitation, he "inadvertently" missed the issue. The Court concludes that the explanation offered by Rodgers is not credible.

        ii. The Court additionally concludes that Rodgers understated the tax on Keller's 2009 and 2010 tax returns by recklessly or intentionally disregarding the passive-activity-loss because he knew of the passive-activity-loss limitation and did not apply it.

    b. Rodgers knew that Keller owned the Kings Road Condo.

    c. Rodgers could not ignore the implications of Rossmith's profit-and-loss statement identifying expenses for the Kings Road Condo and Keller's information claiming expenses for the Kings Road Condo.

25. Rodgers willfully understated the tax on the 2009 and 2010 tax returns for Rossmith and Ross Pac and the 2010 tax return for Freshtech.

26. The 2009 Rossmith tax return prepared by Rodgers contained an understatement of tax as reflected by the following:

    a. The tax return did not report as income $422,969.27 Rossmith received from Ross Pac and Freshtech that was not allocated as reimbursement by Rossmith to a shared expense.

    b. There is no evidence in the record that this money was reimbursement for allocable expenses of Ross Pac and Freshtech.

    c. Rather, the record reflects that it was a transfer in excess of Ross Pac's and Freshtech's allocable expenses and, therefore, constituted income to Rossmith.

    d. The corollary of Barbieri's testimony that simple transfers of money between corporations are not deductible is that the recipient receives income.

    e. The tax return overstated its deduction for salaries and "services/consulting/1099s" by $152,112.92.

    f. The tax return overstated its deduction for taxes and licenses by $88,694.49.

    g. The tax return overstated its deduction for advertising expenses by including $3,201.62 for membership dues at the Manhattan Beach Country Club.

    h. The tax return overstated its rental deduction by including $29,161.67 it paid in expenses for Keller's rental property, which had no relationship to Rossmith's business.

27. The 2009 Ross Pac tax return prepared by Rodgers contained an understatement of tax as reflected by the following:

    a. The tax return included claimed expenses for officers-placed in the costs-of-goods-sold expenses-of $86,841.52 that were not, in fact, incurred by Ross Pac.

b. The tax return included claimed expenses for "salaries - other"-which were placed in the costs-of-goods-sold expenses-of $29,915.66 that were not, in fact, incurred by Ross Pac.

c. The tax return included a $212,000 transfer of funds from Ross Pac to Rossmith in the costs-of-goods-sold expenses when Ross Pac did not in fact purchase goods from Rossmith. Thus, although the money was transferred, Ross Pac claimed a cost-of-goods-sold expense for what was simply a transfer of money among companies with common ownership.

d. The tax return, in its costs-of-goods-sold section, included claimed expenses for payroll taxes, which were $2,712.71 in excess of what Ross Pac actually contributed to payroll taxes.

28. The 2010 Rossmith tax return prepared by Rodgers contained an understatement of tax as reflected by the following:

a. The tax return did not report as income $498,641.85 Rossmith received from Ross Pac and Freshtech that was not allocated as reimbursement by Rossmith to a shared expense.

b. There is no evidence in the record that this money was reimbursement for allocable expenses of Ross Pac and Freshtech.

c. Rather, the record reflects that it was a transfer in excess of Ross Pac's and Freshtech's allocable expenses and, therefore, constituted income to Rossmith.

d. The corollary of Barbieri's testimony that simple transfers of money between corporations are not deductible is that the recipient receives income.

e. The tax return overstated its deduction for dues-and-subscriptions expenses by including $445.38 for membership dues at the Manhattan Beach Country Club.

f.  The tax return overstated its rental deduction by including $326.64 it
paid in expenses for Keller's rental property, which had no relationship
to Rossmith's business.

29.  The 2010 Ross Pac tax return prepared by Rodgers contained an
understatement of tax as reflected by the following:

a.  The tax return overstated its rent deduction by $63,432.76.

b.  The tax return overstated its deduction for dues and subscriptions by at
least $2,275.75.

c.  The tax return overstated its deductions for supplies, repairs, and
maintenance by $9,971.24.

30.  The 2010 Freshtech tax return prepared by Rodgers contained an
understatement of tax as reflected by the following:

a.  The tax return overstated its rent deduction by $48,091.88.

b.  The tax return overstated its deduction for dues and subscriptions by at
least $823.42.

c.  The tax return overstated its deductions for supplies, repairs, and
maintenance by $7,624.02.

31.  Rodgers willfully understated the tax on the 2009 and 2010 corporate tax
returns for 2009 and 2010 for Rossmith and Ross Pac and the 2010 return for Freshtech as
reflected by the following:

a.  Rodgers knew of the operation of Rossmith, Ross Pac, and Freshtech.

b.  Although sending tax organizers to clients, Rodgers did not require
Ross or Rossmith, Ross Pac, or Freshtech to complete them.

c.  Although it was Rodgers's standard practice to have a second person
other than himself review the tax returns after the initial preparation of
tax returns, he did not require that in the case of the tax returns for
Ross, Keller, Rossmith, Ross Pac, and Freshtech.

d.      Instead, this standard operating procedure was skipped in the case of these returns and the returns came straight to Rodgers for review after their initial preparation.

e.      Rodgers knew of the cost-sharing arrangement between Rossmith, Ross Pac, and Freshtech.

f.      Rodgers provided advice to and direction about the cost-sharing arrangement to Ross, Keller, and Styck.

g.      Rodgers and Barbieri knew that money transfered in excess of reimbursement was income to Rossmith.

h.      Rodgers and his associates directed Styck as to the treatment of specific transactions in the books and records of Rossmith, Ross Pac, and Freshtech.

i.      For example, Rodgers directed Styck to classify a $212,000 payment from Ross Pac to Rossmith as costs-of-goods sold when Ross Pac did not purchase any goods from Rossmith.  By improperly inflating Ross Pac's costs-of-goods sold in this manner, Ross Pac improperly reduced its taxable income.

j.      Barbieri directed Styck to rename an account in the books and records of Rossmith from "suspense" to "corporate operating expense."

k.      While Rodgers and his associates directed Styck to make changes to the general ledger and the profit-and-loss statements, they never actually reviewed the general ledgers when preparing the tax returns.

l.      On a profit-and-loss statement of Ross Pac (Ex. 150), Rodgers or one of his associates included in the costs-of-goods-sold section line items designated as contract services, employees, officers, and salaries - other.

m.      The line item for officer salaries specified an expense of $86,841.52 that Ross Pac did not, in fact, incur.

n.    The line item for "salaries - other" of $29,915.55 is without support.

o.    On a subsequent iteration of the Ross Pac profit-and-loss statement, these line items are consolidated into section named "labor" and reflecting an expense of $233,038.45.

p.    This amount, which includes the $86,841 officer expense and $29,915.66 "salaries - other" expense, both of which were not incurred, was included in the costs-of-goods-sold amount on Ross Pac's 2009 tax return.

32.    The Court's conclusion that Rodgers willfully understated the 2009 and 2010 corporate tax returns for 2009 and 2010 for Rossmith and Ross Pac and the 2010 return for Freshtech is supported by the fact that the 2009 and 2010 profit-and-loss statement for Rossmith had no fewer than four iterations. Exs. 110, 145, 146, 147, 150, 151, 152, 154, 162, 165, 235, 237, 240. The iterations were necessary because the initial profit-and-loss statements had negative balances indicating that income and expense items were not adequately characterized. These apparent difficulties created a situation in which a tax return preparer must make reasonable inquiries if the information as furnished appears to be incorrect or incomplete. 26 C.F.R. § 1.6694-1(e)(1). Because Rodgers did not make reasonable inquiries in a situation in which the situation required him to do so, his conduct satisfies the requirements for an assessment of penalties under IRC § 6694(b).

33.    At trial, Rodgers sought the admission of Exhibit 259, a document prepared by Troitskaya. Exhibit 259 was not timely disclosed to the Government. Exhibit 259 was not timely identified in the pretrial documents as required by the Court's Orders. Nor was it a document that Rodgers could properly use to impeach the revenue agent. The Court therefore sustains the Government's evidentiary objections to Exhibit 259.

### Conclusion

For all of the foregoing reasons, the Court concludes that the preponderance of the evidence supports the conclusion that Plaintiff willfully and recklessly prepared tax returns containing an understatement of liability. Plaintiff shall therefore take nothing by way of his

Complaint, and the Government will prevail on its Counterclaim.  The Court affirms the assessment of nine penalties against Rodgers pursuant to 26 U.S.C. § 6694(b).  The Court will issue a Judgment consistent with these Findings of Fact and Conclusions of Law.


  DATED:  November 8, 2017

_____
Percy Anderson
UNITED STATES DISTRICT JUDGE